# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Paul K.W.,                                  Case No. 18-cv-00398 (ECW)

       Plaintiff,
                                            **ORDER**

  v.

Nancy A. Berryhill, Acting Commissioner
of Social Security,

       Defendant.

This matter is before the Court on Plaintiff Paul K.W.'s ("Plaintiff") Motion for
Summary Judgment (Dkt. No. 16) and Defendant Acting Commissioner of Social
Security Nancy A. Berryhill's ("Defendant") Motion for Summary Judgment (Dkt. No.
19). Plaintiff filed this case seeking judicial review of a final decision by Defendant
denying his application for disability insurance benefits. For the reasons stated below,
Plaintiff's Motion is denied, and Defendant's Cross-Motion is granted.

## I.     BACKGROUND

Plaintiff filed a Title II application for disability insurance benefits on October 14,
2014, alleging disability beginning on March 4, 2013. (R. 140.)[1] Plaintiff later amended
his alleged disability onset date from March 4, 2013 to January 1, 2014. (R. 11.)
Plaintiff applied for benefits, alleging disability due to a spinal tumor (atypical) grade 2

---

[1]      The Social Security Administrative Record ("R.") is available at Dkt. No. 11.

meningioma, leg numbness, loss of proprioception[2] (not knowing where a leg is at), burning sensation of the left foot, a learning disability, and balance issues.  (R. 57.)  His application was denied initially and on reconsideration.  (R. 82, 89.)  Plaintiff requested a hearing before an administrative law judge ("ALJ"), which was held on January 17, 2017 before ALJ Virginia Kuhn.  (R. 11-23.)  The ALJ issued an unfavorable decision on February 22, 2017, finding that Plaintiff was not disabled through the date of the ALJ's decision.  (R. 23.)

Following the five-step sequential evaluation process under 20 C.F.R. § 404.1520(a),[3] the ALJ first determined at step one that Plaintiff had not engaged in substantial gainful activity since January 1, 2014.  (R. 13.)

At step two, the ALJ determined that Plaintiff had the following severe impairments: atypical grade 2 meningioma of the thoracic spine after a March 2013

---

[2]    Proprioception: "A sense or perception, usually at the subconscious level, of the movements and position of the body and especially its limbs, independent of vision." STEDMAN'S MEDICAL DICTIONARY, 1576 (28th ed. 2006).

[3]    The Eighth Circuit described this five-step process as follows:

> The Commissioner of Social Security must evaluate: (1) whether the claimant is presently engaged in a substantial gainful activity; (2) whether the claimant has a severe impairment that significantly limits the claimant's physical or mental ability to perform basic work activities; (3) whether the claimant has an impairment that meets or equals a presumptively disabling impairment listed in the regulations; (4) whether the claimant has the residual functional capacity to perform his or her past relevant work; and (5) if the claimant cannot perform the past work, the burden shifts to the Commissioner to prove that there are other jobs in the national economy that the claimant can perform.

*Cox v. Astrue*, 495 F.3d 614, 617 (8th Cir. 2007).

surgery, and obesity. (*Id.*) The ALJ determined that Plaintiff's other impairments were not severe, including his learning disability, hypertension, carpal tunnel syndrome, gallstones, and sleep apnea. (R. 14.)

At the third step, the ALJ determined that Plaintiff did not have an impairment that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. part 404, subpart P, appendix 1. (R. 15.)

At step four, after reviewing the entire record, the ALJ concluded that Plaintiff had the following residual functional capacity ("RFC"):

> [T]o perform light work as defined in 20 CFR 404.1567(b) except no climbing of ladders, ropes or scaffolds, occasional climbing of ramps and stairs, no tasks that would specifically require the act of balancing for completion such as walking along a narrow plank or something of that nature where the actual act of balancing would be a required element for completion of the task, occasional stooping, kneeling, crouching and crawling, no work at unprotected heights or with hazardous machinery, no work tasks that would need to be performed specifically on uneven terrain, and allowing the opportunity to sit or stand at-will while remaining in the work space performing the tasks at hand.

(R. 15-16.)

The ALJ concluded that Plaintiff was unable to perform his past relevant work as a diesel mechanic or service mechanic as it exceeded his RFC. (R. 21.)

At the fifth step of the sequential analysis, and based on the testimony of the vocational expert ("VE"), the ALJ found that through the date last insured, considering the Plaintiff's age, education, work experience, and residual functional capacity, Plaintiff was capable of making a successful adjustment to other work that existed in significant numbers in the national economy including, occupations of collator operator (DOT code

208.685-010), and electronics worker (DOT code 726.687-010).  (R. 22.)  Accordingly, the ALJ deemed Plaintiff not disabled.  (R. 22-23.)  Plaintiff was 52 years old at the time the ALJ's decision.  (R. 23, 140.)

Plaintiff requested review of the decision.  (R. 4.)  The Appeals Council denied Plaintiff's request for review, which made the ALJ's decision the final decision of the Commissioner.  (R. 1-3.)  Plaintiff then commenced this action for judicial review.  The Court has reviewed the entire administrative record, giving particular attention to the facts and records cited by the parties.  The Court will recount the facts of record only to the extent they are helpful for context or necessary for resolution of the specific issues presented in the parties' motions.

## II.    MEDICAL RECORD

Plaintiff had been struggling with progressive lower extremity symptoms in 2013. (R. 256, 262.)  A lesion was found at the T2 with cord compression and edema.  (*Id.*)  A T1-3 laminectomy with a resection of an intradural atypical grade 2 meningioma tumor was performed on March 4, 2013.  (*Id.*; *see also* R. 329-30.)  Some of the T3 root was involved and sacrificed as well.  (*Id.*)

On December 27, 2013, Plaintiff saw Bryan P. O'Neill, M.D., as a part of a continued follow-up related to his surgery.  (R. 265.)  Plaintiff asserted that his general health had been satisfactory and that although the weather had prevented him from doing the conditioning work that he needed to do through walking, he now had a stationary bicycle, and he would use that for conditioning.  (*Id.*)  It was also noted in the report that Plaintiff had been turned down for disability benefits.  (*Id.*)  While Plaintiff estimated that

his neurological function to be about the same, he admitted that he had not begun an intensive conditioning regimen because of the weather. (*Id.*) During the physical examination of Plaintiff, Dr. O'Neill noted that there was "just some very minor wavering when he stands with his feet together and eyes closed. His walking within the confines of the room seems to be quite satisfactory." (*Id.*) Dr. O'Neill opined, "[t]he patient has made a good postoperative recovery. His neurological function is at a very good status, and I expect that it will continue to improve over time." (*Id.*) Dr. O'Neill told Plaintiff that the burning/prickling sensation in his right leg would get better eventually based on the body's ability to repair itself, and his ability to adapt to the sensation. (R. 266.) Dr. O'Neill told Plaintiff to seek a Social Security disability attorney to help him with his disability claim. (*Id.*)

Plaintiff next saw Dr. O'Neill on May 23, 2014 for a neurological assessment. (R. 284.) Plaintiff represented that his health had been satisfactory. (*Id.*) Plaintiff had increased his activity and had lost approximately 10 pounds since his last visit with Dr. O'Neill, but had not been able to return to work because of concerns regarding his ability to do his prior job. (*Id.*) Plaintiff also noted that he had been denied twice for Social Security benefits and did not have legal representation. (*Id.*) While Plaintiff still had paresthesia[4] in his entire right leg, the sense of fullness in the right leg was better (although he still favored his right leg when he walked), and he no longer had to look at

---

[4]     Paresthesia involves "[a] spontaneous abnormal usually nonpainful sensation (e.g., burning, pricking). . . ." STEDMAN'S MEDICAL DICTIONARY, 1425 (28th ed. 2006).

his feet to compensate for the deafferentation.[5]  (*Id.*)  A neurological examination was performed and compared to Plaintiff's prior examination, which Dr. O'Neill found "may be slightly better compared to the prior examination."  (R. 286.)  Further, Dr. O'Neill saw no evidence of residual or recurrent disease.  (*Id.*)  Dr. O'Neill told Plaintiff that he would likely have a neurologic impairment and that it would likely be similar to what he was experiencing, although Dr. O'Neill believed that there would be a mild improvement.  (*Id.*)  According to Dr. O'Neill, the most functionally significant part of his impairment was the deafferentation in the right lower extremity.  (*Id.*)  Dr. O'Neill noted that this could be problematic given the nature of his job as a mechanic.  (*Id.*)  Dr. O'Neill and Plaintiff discussed a work simulation approach, but they decided to revisit this issue when Plaintiff returned in six months.  (*Id.*)  Dr. O'Neill also communicated to Plaintiff that he would be happy to complete any forms in support of his disability claims. (*Id.*)

On May 28, 2014, Plaintiff had a radiation oncology follow-up with Christopher L. Hallemeier, M.D.  (R. 306.)  Plaintiff reported that he has "done reasonably well since his last follow-up. He feels that the lower extremity paresthesias have modestly improved."  (R. 307.)  There was no clear evidence of a recurrent or residual meningioma that was observed as part of Plaintiff's MRI.  (R. 307, 324.)  Plaintiff reported no fatigue or pain.  (R. 307.)

---

[5]     Deafferentation involves "[a] loss of sensory input from a part of the body, usually caused by interruption of the peripheral sensory fibers."  STEDMAN'S MEDICAL DICTIONARY, 494 (28th ed. 2006).

On July 18, 2014, Plaintiff saw his family practitioner Dr. Steve Kivi related to a Boy Scout physical. (R. 442.) Plaintiff stated he was feeling good, but he did have some difficulty with a pins and needle sensation in his right leg since his surgery and it had been recommended that he not place himself in situations where he is climbing ladders or is working at heights due to his increased risk of falls. (*Id.*) The neurological examination revealed normal deep tendon reflexes in Plaintiff's lower extremities, normal sensation in the lower extremities, and his gait was normal. (R. 443.) Dr. Kivi qualified Plaintiff for the Boy Scout camp. (*Id.*)

Plaintiff next saw Dr. O'Neill on August 22, 2014, related to Plaintiff's attempts to obtain Social Security benefits. (R. 304.) Dr. O'Neill noted that Plaintiff still had problems with axial (core) activities and ascending and descending grades, particularly when distracted or when the light was poor. (*Id.*) Plaintiff gave several examples where he had fallen with injuries using steps or stairs, including one instance when he was carrying 50 pounds. (*Id.*) However, Dr. O'Neill also opined that Plaintiff "demonstrated that he has no problems with use of his arms and hands, including over his head. He demonstrated he was able to do a catcher's crouch and rise as well as to turn." (*Id.*) Dr. O'Neill noted he had stated on Plaintiff's activity/work status report that Plaintiff had deafferentation of the lower trunk and right leg as a result of his spinal cord tumor and subsequent surgery and radiotherapy, and that it was likely that this would be a permanent deficit, although Plaintiff may note functional improvement over time or could learn to live with the impairment. (*Id.*) Dr. O'Neill did not believe that Plaintiff could

return to his previous employment at that time, but believed that an unspecified accommodation, such as a supervisor position, might serve Plaintiff well. (*Id.*)

Plaintiff again saw Dr. O'Neill on December 8, 2014 for a neurology consult. (R. 340.) Plaintiff reported that he continued to increase activity, and he represented that his functionally status had improved slightly since he was last seen in August 2014. (*Id.*) He was still experiencing paresthesias in the right leg, but the sense of fullness in the right leg was better. (*Id.*) Plaintiff no longer had to look at his feet to compensate for the deafferentation, and he was able to navigate in the dark and when he closes his eyes in the shower. (*Id.*) Plaintiff also reported that he had done better since August 2014 in terms of injuries, having only fallen once on ice accidently with his wife. (*Id.*) Dr. O'Neill noted during Plaintiff's physical examination that there was an improvement in several of the domains of his right leg, such as joint position sense at the right toes, Romberg sign,[6] and the mechanics of walking. (*Id.*) There was also a slight increase in tone at the right knee. (*Id.*) On the same date, Plaintiff reported to Dr. Hallemeier that he had experienced "stability to slight improvement in his lower extremity paresthesias." (R. 339.) Plaintiff also reported no fatigue and his pain level was 4 out of 10. (*Id.*)

On December 31, 2014, State Agency Physician, Susan Johnson, M.D. opined that Plaintiff had the ability to occasionally lift or carry 20 pounds; could frequently lift or carry 10 pounds; could stand and walk with normal breaks for six hours out of an 8-hour

---

[6]     Romberg Sign: "when a patient, standing with feet approximated becomes unsteady or much more unstable with eyes closed." Stedman's Medical Dictionary, 1771 (28th ed. 2006).

work day; and had an unlimited ability to push and pull (other than those related to the limitation on lifting and or carrying). (R. 61-62.) According to Dr. Johnson, Plaintiff could occasionally climb ramps and stairs, climb ladders, balance, stoop, kneel, crouch, and crawl. (R. 62.) Further, Dr. Johnson found that Plaintiff had no manipulative, visual, or communicative limitations. The only environmental limitation was: "Avoid concentrated exposure" to hazards. (R. 62-63.) The environmental limitations were based on the fact that Plaintiff was to avoid uneven surfaces and unprotected heights. (R. 63.) Dr. Johnson believed that Plaintiff could sustain a light physical RFC. (R. 64.)

Plaintiff returned to Dr. O'Neill for a reassessment of his meningioma on February 16, 2015. (R. 337.) Plaintiff again reported an increase in his activity and improvement in his functional status. (*Id.*) While Plaintiff had paresthesias, his sense of fullness was better, and he no longer had to look at his feet to compensate for deafferentation. (*Id.*) Dr. O'Neill reported virtually no change in Plaintiff's neurological examination from that recorded in December 2013. (*Id.*) Dr. O'Neill opined that he did not believe that Plaintiff's neurological deficit would allow him to return to the level of functioning necessary perform his previous employment. (*Id.*)

On reconsideration of the Social Security Administration's ("SSA") benefits determination, State Agency Physician Charles Grant, M.D. reevaluated Plaintiff's medical records and opined on March 18, 2015 that Plaintiff had the same RFC and limitations as previously assigned by State Agency Physician, Dr. Johnson. (R. 72-75.) Dr. Grant noted:

[H]e was seen for a f/u with neuro on 02/16/2015.visit notes that he has continued to increase his activity. He still has paresthesias in his left leg. The clmts past work was talked about and it was felt that he would not be able to return to it in full capacity. A review of the initial assessment finds it is consistent with the mer and the new mer would not change it.

(R. 71.)

On September 14, 2015, Plaintiff had a radiation oncology follow-up with Dr. Hallemeier. (R. 344.) Plaintiff reported that his neurologic function was unchanged over the previous 6 months and Dr. Hallemeier concluded that Plaintiff's neurological function was stable. (*Id.*) Plaintiff reported no fatigue. (R. 345.)

On September 15, 2015, Plaintiff saw Dr. O'Neill for a neurologic assessment. (R. 346.) Plaintiff's general health had been satisfactory, and he continued to increase his activity. (*Id.*) Plaintiff had no pain. (*Id.*) Plaintiff noted that the deafferentation in his leg did not require visual feedback unless he was in complex surroundings, such as large crowds at the State Fair. (*Id.*) Plaintiff also reported that towards the end of the day he had mechanical-type pain that extended up from the upper neck and shoulders into the head and forehead regions. (*Id.*) Plaintiff took Tylenol to treat his pain. (*Id.*) Plaintiff noted that he had been terminated from his employment and denied Social Security benefits. (*Id.*) Dr. O'Neill reiterated his willingness to help in any way he could, going so far to say that "I have told him I am more than happy to assist in his getting a favorable disability decision." (R. 346-47.) According to Dr. O'Neill, one of Plaintiff's main problems in addition to the mechanical-type pain described above was the neuropathic pain that extends at approximately the T4 dermatome, left more than right. (R. 346.) It rarely interfered with sleep but often manifested during periods of increased

mechanical-type pain and sometimes as a reflex in terms of stretching or touching. (*Id.*) The neurological examination of Plaintiff showed improvement. (*Id.*) The neurological examination showed a reduced touch and temperature sensation in one leg and normal temperature and touch sensation in the other leg. (R. 349.)

During his January 19, 2016 sleep evaluation with Charles Jones, M.D., Plaintiff's neurological evaluation showed some finger numbness, but no episodes of transient weakness. (R. 435.)

On April 6, 2016, Plaintiff saw Nicholas L. Zalewski, M.D. for a neurologic assessment. (R. 350.) Plaintiff represented to Dr. Zalewski that he overall generally felt stable. (*Id.*) He did not feel that there had been any drastically new decline in his symptoms, but his right leg still had an ongoing numbness and pins/needles sensation from the buttocks down to the toes. (*Id.*) Plaintiff felt that the sensation worsened when he rested too long and that he needed to keep moving the leg sometimes when he is sitting down. (*Id.*) Otherwise, if he stood up, it took him awhile to engage the leg and get it to start moving as much as he would like. (*Id.*) He still needed to be conscious at times regarding the proprioception in the right leg. (*Id.*) Plaintiff had more difficulty walking on uneven surfaces, and had recently had two falls, including one fall happening while hiking. (*Id.*) Plaintiff also had some ongoing burning sensation in his left foot up to about the ankle region. (*Id.*) Plaintiff represented that this was mild but an intermittent ongoing and annoying pain that never went away. (*Id.*) Plaintiff also reported back pain that came and went, and that he took Aleve and ibuprofen as needed to alleviate the pain. (*Id.*) Plaintiff was not using any aids to help him walk and he was able to perform all of

his activities of daily living. (R. 350-51.) The physical examination of Plaintiff showed that he was not in any acute distress. (R. 351.) His musculoskeletal examination indicated that his Phalen's[7] and Tinel's[8] signals were negative and no thernar atrophy was observed. (*Id.*) His neurological examination was stable with some decreased sensation to pinprick and temperature in the right lower extremity and an up-going right plantar reflex. (*Id.*) A clear sensory level as previously documented was difficult to elicit, but otherwise the strength examination was essentially normal. (*Id.*) Plaintiff rated his fatigue 2 out of 10. (R. 354.) Dr. O'Neill agreed with Dr. Zalewski's findings and reiterated his willingness to cooperate with Plaintiff regarding his disability hearing. (R. 357.) While Dr. Zalewski noted that there was some loss of pinprick also in the median nerve distribution bilaterally on the tips of his fingers consistent with carpal tunnel syndrome, Dr. O'Neill concluded that the carpal tunnel symptoms described by Dr. Zalewski were a nuisance but do not appear to be functionally significant, and he is able to "live with" the paresthesias. (R. 351, 357.)

On April 25, 2016, Plaintiff was seen in the emergency room related to abdominal pain. It was noted during his examination that Plaintiff did not have any focal weakness or numbness and no deficits were noted as part of his neurological examination. (R. 365.)

---

[7] Phalen's test is considered to be a classic diagnostic test for Carpal Tunnel Syndrome. *See* https://www.ncbi.nlm.nih.gov/pubmed/12050999.

[8] Tinel's signal is "a sensation, of tingling or of pins and needles." STEDMAN'S MEDICAL DICTIONARY, 1772 (28th ed. 2006).

On May 16, 2016, Plaintiff saw Dr. Kivi related to foot pain, involving a burning sensation in both feet. (R. 414.) It was noted that Plaintiff had noticed a decrease in numbness and that he had just started taking the medication nortriptyline. (*Id.*) Plaintiff represented that he was working on redoing his patio with the help of his son. (*Id.*)

On August 12, 2016, Plaintiff presented to the Mayo Clinic for a Boy Scout physical. (R. 411.) According to the note by the attending nurse practitioner:

> He will be participating in a CSEA Base adventure that will involve 6 days on a sailboat, including fishing and snorkeling. **He does not feel he will have any problems with this. His only restrictions are for climbing and harness use due to the impact it would have on his back on his back postoperatively.**
>
> He brings in a form today to be completed.
>
> **Paul reports nortriptyline has been helping a lot with the pins and needle sensation and decreased proprioception to the right leg as well as to the burning within the left leg. He has described that this has caused some balance problems, but they are significantly improving on the nortriptyline**.

(*Id.* (emphasis added).) Plaintiff reported feeling well without complaints. (R. 412.) During his examination, Plaintiff was able to tandem walk after some difficulty faltering at the beginning, but once he gained his balance, he did it without difficulty for at least 5 to 6 steps and was able to walk heel to toe without difficulty. (*Id.*) The Boy Scout form was completed and approved. (R. 413.) Plaintiff testified at the hearing before ALJ that he did not do any activities, but merely sat and supervised the boys through the trip. (R. 42-44.)

On August 24, 2016, Plaintiff saw his family practitioner Dr. Kivi related to a number of complaints. (R. 408.) Dr. Kivi noted that Plaintiff was "also following up

regarding leg paresthesias. He had a meningioma removed from his back several years ago and has had persistent symptoms in his left leg since that time. He was started on **nortriptyline which he states has controlled his symptoms**." (*Id.* (emphasis added).)) Plaintiff's neurological examination revealed normal deep tendon reflexes throughout. (R. 409.)

On November 1, 2016, Plaintiff reported to Dr. Kivi that the gabapentin for his neuropathy pain had provided significant improvement, but had caused him to gain weight. (R. 404.) Plaintiff did "state that he has been more active since his leg has not been bothering him so much." (*Id.*) Dr. Kivi found that Plaintiff's peripheral neuropathy was improved on gabapentin. (*Id.*)

Plaintiff saw Ugur T. Sener, M.D. on November 22, 2016 with reports of increased falls over the previous several months with one occurring every two weeks. (R. 377.) Plaintiff did not report any difficulty with muscle weakness per se and felt that his legs were strong, similar to how they were like before the summer. (R. 378.) Plaintiff still reported some burning pain primarily located at the bottoms of both feet. (*Id.*) It radiated down Plaintiff's legs, coming down his legs as a pins and needles sensation that had been present since his surgery. (*Id.*) Plaintiff noticed no difficulty with hand coordination. (*Id.*) In his review of Plaintiff's systems, Dr. Sener noted that Plaintiff had gained 50 pounds over the past month and half, which may have been attributable to his starting to take gabapentin for neuropathic pain. (*Id.*) The gabapentin helped with neuropathic pain, but he still experienced burning pain along the bottom of both feet. (*Id.*) Plaintiff represented that he was largely independent in activities of daily living, but

was having increased falls and some gait difficulty.  (R. 379.)  Plaintiff reported trying to

go swimming on a regular basis.  (*Id.*)  The motor examination showed that Plaintiff's

bilateral upper and lower extremities were normal throughout.  (R. 379.)  Significantly,

no ankle dorsiflexion or plantarflexion weakness was noted on Plaintiff's bilateral lower

extremities.  (R. 379-80.)  Plaintiff had a decreased pinprick sensation in both feet.  (R.

380.)  He also had a decreased proprioception sensation, which was worse on the right

foot compared to the left.  (*Id.*)  However. Plaintiff's arms were normal.  (*Id.*)  Plaintiff's

gait was abnormal as it was slightly broad, and Plaintiff was a little more deliberate in

picking up his right foot as he walked.  (*Id.*)  Plaintiff's stride length was slightly

diminished, and the swing was slightly less pronounced than normal.  (*Id.*)  Plaintiff

required two to three steps to complete a 180-degree turn and was able to walk on his

toes and his heels.  (*Id.*)  He did have some difficulty with tandem gait and required some

mild assistance in performing this maneuver.  (*Id.*)  On Romberg testing, he demonstrated

a little bit of a sway, but he did not lose his balance or start to fall.  (*Id.*)  Dr. Sener noted

that Plaintiff's increased frequency of falls could have been due to of a recent sprained

ankle injury with Plaintiff taking some time to recover from that injury[9] and likely getting

deconditioned over that time, resulting in the gain of over 50 pounds.  (*Id.*)  Dr. Sener

opined that he "otherwise does not have any marked changes on his neurologic

examination to suggest a severe worsening of his strength or coordination in the lower

extremities."  (*Id.*)

---

[9] Plaintiff had rolled his ankle in March of 2016 after a fall.  (R. 423.)  No neurological deficits were noted at that time.  (*Id.*)

Dr. O'Neill reviewed Dr. Sener's findings with Plaintiff on the same date. (R. 382.) Dr. O'Neill also examined Plaintiff and noted that the findings were similar to what was recorded in September 2015. (*Id.*) Power was equal in both legs, and Dr. O'Neill did not detect spasticity in the right leg, which had been noticed in the past. (*Id.*) The sensory distribution also appeared to be unchanged. (*Id.*) Dr. O'Neill suspected that Plaintiff's deconditioning related to the inactivity after his sprained ankle, weight gain, the effects of the gabapentin, and perhaps depression. (*Id.*) Dr. O'Neill counseled Plaintiff on losing weight and suggested that Dr. Kivi might arrange for Plaintiff to see a dietician to help design a reasonable diet that would result in weight loss. (*Id.*) Plaintiff represented that he enjoyed swimming and could swim. (*Id.*)

### III.  LEGAL STANDARD

Judicial review of the Commissioner's denial of benefits is limited to determining whether substantial evidence on the record as a whole supports the decision, 42 U.S.C. § 405(g), or if the ALJ's decision resulted from an error of law. *Nash v. Comm'r, Soc. Sec. Administration*, 907 F.3d 1086, 1089 (8th Cir. 2018) (citing 42 U.S.C. § 405(g); *Chismarich v. Berryhill*, 888 F.3d 978, 979 (8th Cir. 2018)). "'Substantial evidence is less than a preponderance, but enough that a reasonable mind would find it adequate to support the Commissioner's conclusions.'" *Id.* (quoting *Travis v. Astrue*, 477 F.3d 1037, 1040 (8th Cir. 2007)). The Court "considers evidence that detracts from the Commissioner's decision as well as evidence that supports it." *Id.* "If substantial evidence supports the Commissioner's conclusions, this court does not reverse even if it would reach a different conclusion, or merely because substantial evidence also supports

the contrary outcome." *Id.* (citation omitted).  In reviewing the record for substantial evidence, the Court may not substitute its own judgment or findings of fact for that of the ALJ.  *See Hilkemeyer v. Barnhart*, 380 F.3d 441, 445 (8th Cir. 2004).

## IV.    DISCUSSION

Plaintiff argues that the Commissioner's decision related to his RFC is not based upon substantial evidence on the record as a whole.  (Dkt. No. 17 at 15.)  Specifically, Plaintiff argues that the Commissioner erred because:  (1) the ALJ did not give controlling weight to the January 2017 residual functional capacity opinion of Plaintiff's treating neurologist Dr. Brian O'Neill, especially in light of the fact that he is a specialist; (2) the ALJ improperly accorded "great weight" to the conclusions of the non-treating, non-examining State Agency generalist physicians that Plaintiff retained the ability to be on his feet for six hours out of an eight hour work day and lift 20 lbs. occasionally; and (3) the resulting hypothetical to the VE was not based on substantial evidence because it was based on a flawed RFC.

### A.    The Weight Assigned to the Treating Physician's Opinion

According to Plaintiff, the ALJ failed to properly consider the January 2017 residual functional capacity opinion of Plaintiff's treating neurologist Dr. O'Neill, and therefore formulated an RFC that failed to incorporate all of his limitations.

In a January 13, 2017 letter in response to Plaintiff's attorney's communication, Dr. O'Neill represented that he had read the SSA's definitions for "light"[10] and

---

[10]    Pursuant to the Social Security regulations, light work is defined as follows:

"sedentary" [11] exertional levels and that based on the Plaintiff's "medical records, my experience, and my treatment of [Plaintiff], it is my opinion that subsequent to January 1, 2014, [Plaintiff's] medical condition would reasonably have prevented him from sustaining activities beyond what is contemplated by the definition of a sedentary exertional level." (R. 454.) According to Dr. O'Neill, Plaintiff underwent a significant surgical procedure to remove a WHO grade II meningioma I, from his thoracic spine, and that since that procedure Plaintiff had exhibited substantial gait abnormalities due to

---

Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 C.F.R. § 404.1567(b).

[11] Pursuant to the Social Security regulations, sedentary work is defined as follows:

Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

20 C.F.R. § 404.1567(a). For the purposes of a sedentary RFC, "Occasionally" means occurring from very little up to one third of the time, and would generally total no more than about 2 hours of an 8-hour workday." SSR 96-9p, 1996 WL 374185 at *3 (Jul. 2, 1996) (emphasis added).

injury to the proprioceptive pathways in the spinal cord. (*Id.*) Dr. O'Neill noted that Plaintiff was functionally deafferented and had experienced a considerable weight gain due to both his medications and inactivity caused by his pain and gait difficulties. (*Id.*) Dr. O'Neill did not believe that Plaintiff was capable of being on his feet for more than two hours out of eight-hour work day on a consistent basis and was incapable of lifting 20 pounds occasionally over a sustained and continued employment without experiencing increasing fatigue and pain. (*Id.*) Dr. O'Neill noted that Plaintiff's complaints regarding his limitations were consistent with objective medical findings. (R. 455.)

As it relates to the opinions of Dr. O'Neill, the ALJ found as follows:

> The undersigned gives little weight to the January 2017 letter and opinion of Dr. Brian O' Neil. [sic] (Exhibit B6F) Dr. O'Neill was the claimant's treating neurologist, who saw him about every 6 months through April 2016. The undersigned notes the absence of specificity of restrictions, simply referring to definitions of light and sedentary, and no supportive medical findings for the opinion of no more than sedentary work with 2 hours on his feet and unable to lift 20 pounds. This opinion is not supported by the [sic] this provider's and the other progress notes/examinations as no specific limitations are set forth contemporaneously with visits and only generic statements of not able to do his prior mechanic work. The provider observations, examinations, imaging, course of treatments discussed above and the claimant's overall functioning do not support the opined sedentary opinion reflected in this letter. The statements and/or opinions from Dr. O'Neill focused on the claimant's inability to perform his mechanic work with no discussion of other work or specific work limitations at any of his visits.

(R. 20.)

Instead, the ALJ gave great weight to State Agency medical consultants:

> In assessing the residual functional capacity, the undersigned gives great weight to the light exertional range opined by the State Agency medical consultants at exhibits B2A and B3A as their assessed areas of limitation are supported by their review of the records using expertise and specialized

knowledge of assessing impairments and limitations within the Social Security disability standard. Their assessed limitations are supported by no neurological changes to suggest a significant worsening of functioning and reduction to a sedentary exertional level. However, the sit/stand option is consistent with the claimant's reported numbness, but no weakness, in his legs. As such, the undersigned adopts the light range of work opined and supported by the objective medical evidence, observations, and the claimant's overall functioning.

(*Id.*)

"A disability claimant has the burden to establish her RFC." *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004). The Eighth Circuit has held that "a 'claimant's residual functional capacity is a medical question.'" *Id.* (quoting *Lauer v. Apfel*, 245 F.3d 700, 704 (8th Cir. 2001)). "'[S]ome medical evidence' must support the determination of the claimant's RFC, and the ALJ should obtain medical evidence that addresses the claimant's 'ability to function in the workplace.'" *Id.* (quoting *Dykes v. Apfel*, 223 F.3d 865, 867 (8th Cir. 2000) (per curiam)). However, "there is no requirement that an RFC finding be supported by a specific medical opinion." *Hensley v. Colvin*, 829 F.3d 926, 932 (8th Cir. 2016) (citing *Myers v. Colvin*, 721 F.3d 521, 526-27 (8th Cir. 2013); *Perks v. Astrue*, 687 F.3d 1086, 1092-93 (8th Cir. 2012)). Rather, the RFC should be "based on all of the relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of his limitations." *Id.* (quoting *Myers*, 721 F.3d at 527). "Moreover, an ALJ's failure to cite specific evidence does not indicate that such evidence was not considered." *Wildman v. Astrue*, 596 F.3d 959, 966 (8th Cir. 2010) (citation omitted) (highly unlikely that ALJ did

not consider and reject physician's opinion when ALJ made specific references to other findings set forth in physician's notes).

"A treating physician's opinion is generally given controlling weight, but is not inherently entitled to it. An ALJ may elect under certain circumstances not to give a treating physician's opinion controlling weight. For a treating physician's opinion to have controlling weight, it must be supported by medically acceptable laboratory and diagnostic techniques and it must not be 'inconsistent with the other substantial evidence in [the] case record.'"[12] *Hacker v. Barnhart*, 459 F.3d 934, 937 (8th Cir. 2006) (quoting 20 C.F.R. § 404.1527(d)(2)) (citing *Goff*, 421 F.3d at 790; *Ellis v. Barnhart*, 392 F.3d 988, 994 (8th Cir. 2005)). "A treating physician's own inconsistency may also undermine his opinion and diminish or eliminate the weight given his opinions." *Id.* (citing *Prosch v. Apfel*, 201 F.3d 1010, 1013 (8th Cir. 2000)); *see also Anderson v. Astrue*, 696 F.3d 790, 793 (8th Cir. 2012) ("However, '[a]n ALJ may discount or even disregard the opinion of a treating physician where other medical assessments are supported by better or more thorough medical evidence, or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions.'") (quoting *Wildman v. Astrue*, 596 F.3d 959, 964 (8th Cir. 2010)) (alteration in original) (internal quotation omitted). Moreover, "a treating physician's opinion that a claimant is disabled or unable to work, does not carry any special significance, because it invades the

---

[12]    Generally, the Commissioner gives "more weight to the medical opinion of a specialist about medical issues related to his or her area of specialty than to the medical opinion of a source who is not a specialist." 20 C.F.R. § 404.1527(c)(5).

province of the Commissioner to make the ultimate determination of disability."

*Davidson v. Astrue*, 578 F.3d 838, 842 (8th Cir. 2009) (cleaned up).

Based on a careful review of the record, the Court concludes that the ALJ gave appropriate weight to the opinion of Dr. O'Neill, as his opinion that Plaintiff is limited to a sedentary RFC, and opining that Plaintiff could not be on his feet for more than two hours per eight-hour workday or occasionally lift 20 pounds, is not supported by the objective medical record or Plaintiff's reported activities. This includes, but is not limited to: Dr. O'Neill's statement that Plaintiff was able to adequately walk as early as December 2013, with his report that Plaintiff showed a "very good" neurological status with only minor wavering when his eyes were shut (R. 265); that he no longer had to look at his feet to compensate for his deafferentation as early as May 2014 (R. 284); Plaintiff's request for a medical qualification in July 2014 to participate in Boy Scout activities, where it was noted that the sensation in his lower extremities was normal and he demonstrated a normal gait, with Plaintiff's only representations regarding limitations pertaining to heights (R. 442-43); Dr. O'Neill's opinion in August 2014, that an accommodation was not out of the question for Plaintiff's past employment, that Plaintiff demonstrated he had no problems with use of his arms and hands, including over his head, and was "able to do a catcher's crouch and rise as well as to turn" (R. 304); Dr. O'Neill's opinion in February 2015 that while Plaintiff could not return to his previous work, Plaintiff reported an increase in his activity and improvement in his functional status, his sense of fullness was better, and he no longer needed to look at his feet to compensate for his deafferentation (R. 337); Dr. Hallemeier's September 2015

conclusion that Plaintiff's neurological function was stable (R. 344); Plaintiff's

representation in September 2015 that the deafferentation in his leg did not require visual

feedback unless he is in complex surroundings, such as large crowds at the State Fair (R.

346); a stable neurological examination with only some decreased sensation to pinprick

and largely normal strength examination as of April 2016, along with Plaintiff's

representation that he was not using any aids to help him walk and he was able to

perform all of his activities of daily living (R. 350-51); Plaintiff's May 2016

representation that he was working on re-doing his patio with the help his son (R. 414);

Plaintiff's August 2016 representation to a health provider that he did not believe he

would have any problems participating in a Boy Scout base adventure that would involve

6 days on a sailboat, including fishing and snorkeling, and that his new medication was

helping a lot with balance, the burning sensation in his feet, and the pins and needle

sensation in his lower extremities (R. 411-12); and Plaintiff's representation in at the end

of August 2016 that he had significant improvement on medication and that he had been

more active (R. 408-09). While Plaintiff appeared to have a period of decompensation in

November 2016 related to Plaintiff's claims of falls, Dr. O'Neill noted that the power in

Plaintiff's legs was equal, Dr. O'Neill did not detect spasticity in the right leg, which had

been noticed in the past, and the sensory distribution appeared to be unchanged. (R.

382.) As opposed to a chronic continuing limitation, Dr. O'Neill suspected that the

alleged recent falls were due to deconditioning related to inactivity after Plaintiff's

sprained ankle and resulting weight gain and counseled Plaintiff on losing weight. (*Id.*)

It is important to note that nowhere in the medical record, save for Dr. O'Neill's opinion

letter, is Plaintiff limited to only standing for only two-hours per workday or given a weight limitation.[13]

Accordingly, this Court concludes that the ALJ's assessment of Dr. O'Neill's opinion of a sedentary RFC for Plaintiff and the respective weight assigned to his opinion is supported by substantial evidence in the record as whole, including representations in the medical record and Plaintiff's activities (such as participating in Boy Scout activities and re-doing his patio). *See Fentress v. Berryhill*, 854 F.3d 1016, 1020 (8th Cir. 2017) (finding that if a treating physician's opinion is inconsistent with other substantial evidence, such as physical examinations or claimant's daily activities, the ALJ may discount or disregard the opinion); *Anderson v. Astrue*, 696 F.3d 790, 794 (8th Cir. 2012) (no error in "minimal weight" assigned to treating neurologist's opinion where "the significant limitations [neurologist] expressed in his evaluation are not reflected in any treatment notes or medical records") (citation omitted); *Hacker v. Barnhart*, 459 F.3d 934, 938 (8th Cir. 2006) (discounting treating physician's opinion because it was inconsistent with claimant's daily activities); SSR 96–2p, 1996 WL 374188, at *3 (July 2, 1996) (an ALJ may discount the opinion of a treating physician if it is inconsistent with

---

[13]     The closest reference in the medical record to a weight restriction outside of the November 2017 letter was Plaintiff's claim in August 2014 to Dr. O'Neill that at some point in time he had tumbled when he was carrying approximately 50 pounds in front of him on steps or stairs.  (R. 304.)

the evidence in the record, including but not limited to the medical evidence and a claimant's own reported activities).[14]

Plaintiff also argues that the ALJ's reliance on State Agency Physicians was improper, especially in light of the fact that Dr. O'Neill is a specialist. (Dkt. No. 17 at 17, 19.) "State agency medical and psychological consultants are highly qualified physicians and psychologists who are experts in the evaluation of the medical issues in disability claims under the Act." SSR 96-6p, 1996 WL 374180, at *2 (S.S.A. July 2, 1996). In fact, an ALJ "must consider and evaluate" a state agency medical consultant's residual functional capacity assessment. *Id.* at *4. Moreover, in appropriate circumstances, opinions from state agency consultants "may be entitled to greater weight than the opinions of treating or examining sources." *Id.* at *3. The Eighth Circuit has affirmed ALJ decisions that properly discounted treating physicians' opinions and gave significant weight to state agency assessments. *See, e.g.*, *Smith v. Colvin*, 756 F.3d 621, 626-27 (8th Cir. 2014); *Michel v. Colvin*, 640 F. App'x 585, 593 (8th Cir. 2016)

---

[14] Plaintiff asserts that the Commissioner's arguments related to its claim that the ALJ correctly discounted the opinion of Dr. O'Neill are an improper post-hoc rationalization of the ALJ's decision to deny him benefits, because the Commissioner's arguments were not raised by the ALJ. (Dkt. No. 25 at 3-4.) Plaintiff does not specify the argument(s) at issue. Nevertheless, the Court disagrees with Plaintiff's assertion. The Commissioner's arguments included that Dr. O'Neill's opinion was properly considered by the ALJ in light of the medical record and Plaintiff's activities. (Dkt. No. 20 at 8-9.) The Court finds that the ALJ determined that the RFC propounded, and the weight afforded to Dr. O'Neill's opinion, was supported by the medical evidence and Plaintiff's daily activities. (*See* R. 20-21.)

(identifying exceptions to the general rule that an ALJ should credit a treating physician's opinion over other medical opinions).

It is important to emphasize that the ALJ did not entirely reject Dr. O'Neil's opinion. While the Court gave little weight to Dr. O'Neill's sedentary limitations and great weight to the light RFC propounded by the State Agency Physicians, the ALJ, based on the medical record showing numbness and weakness of Plaintiff's legs, also provided him with a sit/stand at accommodation as part of his RFC.[15] (R. 20.) Based on

---

[15] SSR 83-10 states that the full range of light work requires standing or walking for a total of approximately six hours of an eight-hour workday, with intermittent sitting during the remaining time. SSR 83-10, 1983 WL 31251, at *6. SSR 83-12 addresses special situations in which an individual needs to alternate between sitting and standing:

> In some disability claims, the medical facts lead to an assessment of RFC which is compatible with the performance of either sedentary or light work except that the person must alternate periods of sitting and standing. The individual may be able to sit for a time, but must then get up and stand or walk for a while before returning to sitting. Such an individual is not functionally capable of doing either the prolonged sitting contemplated in the definition of sedentary work (and for the relatively few light jobs which are performed primarily in a seated position) or the prolonged standing or walking contemplated for most light work. (Persons who can adjust to any need to vary sitting and standing by doing so at breaks, lunch periods, etc., would still be able to perform a defined range of work.)

> There are some jobs in the national economy—typically professional and managerial ones—in which a person can sit or stand with a degree of choice. If an individual had such a job and is still capable of performing it, or is capable of transferring work skills to such jobs, he or she would not be found disabled. However, most jobs have ongoing work processes which demand that a worker be in a certain place or posture for at least a certain length of time to accomplish a certain task. Unskilled types of jobs are particularly structured so that a person cannot ordinarily sit or stand at will. In cases of unusual limitation of ability to sit or stand, a VS should be consulted to clarify the implications for the occupational base.

a careful review of the record, the Court concludes that the ALJ gave appropriate weight to the opinion of Plaintiff's treating physician Dr. O'Neill based on the record as a whole, and that the RFC formulated by the ALJ is supported by "some medical evidence." [16] *See Cox v. Astrue,* 495 F.3d 614, 619 (8th Cir. 2007) ("Because a claimant's RFC is a medical question, an ALJ's assessment of it must be supported by some medical evidence of the claimant's ability to function in the workplace.").

## B.    VE Hypothetical

Plaintiff argues that the ALJ's hypothetical propounded to the VE was improper because the RFC determined by the ALJ conflicted with the restrictions imposed by Plaintiff's treating provider.  (Dkt. No. 17 at 20-21.)  The ALJ's RFC finding was supported by substantial evidence in the record as a whole.  The ALJ's hypothetical mirrored the limitations that were accounted for in the RFC.  A hypothetical question need only include the impairments and limitations that the ALJ finds are credible and substantially supported by the record as a whole.  *See Scott v. Berryhill*, 855 F.3d 853,

---

SSR 83-12, 1983 WL 31253, at *4.  In this case, the VE was consulted to clarify the implications of the limitation of the ability to sit or stand for the occupational base.  (R. 48-49.)

[16]    Plaintiff argues the ALJ erred by putting her expertise ahead of that of treating provider, ignoring the requirement that the ALJ cannot substitute their opinion for a that of a physician (Dkt. No. 17 at 19).  This Court disagrees.  When medical evidence conflicts, it is the obligation of the ALJ to consider "all of the medical evidence, . . . weigh this evidence in accordance with the applicable standards, and attempt to resolve the various conflicts and inconsistencies in the record."  *Hudson ex. rel. Jones v. Barnhart*, 345 F.3d 661, 667 (8th Cir. 2003).  The ALJ did not substitute her opinion for that of treating physician, but merely weighed the evidence in the record to resolve the various conflicts.

857 (8th Cir. 2017) (a properly phrased hypothetical includes limitations mirroring those of claimant); *see also Lacroix v. Barnhart*, 465 F.3d 881, 889 (8th Cir. 2006) ("The ALJ's hypothetical question to the vocational expert needs to include only those impairments that the ALJ finds are substantially supported by the record as a whole."); *Vandenboom v. Barnhart*, 421 F.3d 745, 750 (8th Cir. 2005). Thus, the ALJ's hypothetical to the VE was proper.

## IV.   ORDER

Based on the files, records, and proceedings herein, **IT IS ORDERED THAT:**

1.      Plaintiff Paul K.W.'s Motion for Summary Judgment (Dkt. No. 16) is **DENIED**;

2.      Defendant Acting Commissioner of Social Security Nancy A. Berryhill's Motion for Summary Judgment (Dkt. No. 19) is **GRANTED**; and

3.      This case is **DISMISSED WITH PREJUDICE**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

DATED: May 10, 2019                          *s/ Elizabeth Cowan Wright*
                                             ELIZABETH COWAN WRIGHT
                                             United States Magistrate Judge